DECISION AND JUDGMENT ENTRY
This is a delayed appeal brought by Edwin Williams to challenge his convictions in the Lucas County Court of Common Pleas for abduction (a violation of R.C. 2905.02(A)(2)) and for gross sexual imposition (a violation of R.C. 2907.05(A)(1)) and to challenge the trial court's ruling that he fits the sexual predator classification found in R.C.2950.01(E). Because we find that Williams: (1) was not prejudiced by the introduction into evidence of the information that he had a prior conviction for a crime of dishonesty; (2) cannot meet the test for showing ineffective assistance of counsel; and (3) was not improperly classified a sexual predator, we affirm the rulings Williams has challenged on appeal.
The record shows that Williams was originally indicted by the grand jury sitting in Lucas County, Ohio, for kidnaping, attempt to commit rape and gross sexual imposition. Williams pleaded not guilty to all of the charges.
The case proceeded to trial. The trial transcript shows that Williams and the state's witnesses were in agreement on some of the central facts that led to the charges in this case. However, there were some important issues upon which the witnesses differed.
Everyone agreed that Williams met the fourteen-year-old victim's father and two of her older brothers when they all worked together at a local restaurant. Williams became a trusted family friend. He spent a great deal of time at the victim's family home, even to the point of taking the family dog for walks and spending holidays like Thanksgiving and Christmas with the family.
During the early morning hours (approximately three o'clock) Williams arrived at the victim's family home. He spent a couple of hours in the basement, drinking beer and playing pool. Williams testified that he played pool with both the victim's father and an older brother of the victim. However, the victim's father testified that only he and Williams played pool and the victim's older brother also testified that he did not recall playing pool with Williams on the morning in question.
The victim's father testified that after a couple of hours he told Williams he was going to go to bed. The victim's father testified that he let Williams out of a side door to the basement, and then locked a second door that was at the top of the stairs leading to the first floor of the family home from the basement. The victim's father said he went to bed and did not awaken again until he heard his wife yelling threats at Williams. Williams first testified that the victim's father went to bed while Williams and the victim's older brother were still playing a game of pool. He said that when he and the older brother finished the game, the older brother went upstairs and he did not see him again. In an apparent inconsistency, he later testified that the door at the top of the basement stairs was locked by the victim's father before the victim's father went to bed.
Williams testified that he had another beer and smoked a few cigarettes after the victim's oldest brother went upstairs. He said he then turned out the lights in the basement and went out the side door, pulling it shut behind himself as he went outside.
Williams testified that after he went out the side door of the basement, he went around to the front door of the house. Williams knew that the front door was kept unlocked. He opened the front door and went to a small room off the kitchen that was serving as the fourteen-year-old victim's temporary bedroom. The bedrooms usually used by the victim and by her parents, respectively, were being redecorated, so the victim was sleeping in a small room off the kitchen and her parents were sleeping in the basement.
Williams testified that while he was playing pool with one of the victim's older brothers and her father, he learned that the victim had been attacked and beaten by some neighborhood girls the evening before. While the victim's older brother denied playing pool with Williams, he did recall having a conversation with Williams sometime about the attack on his sister. Apparently the beating had something to do with a dispute relating to the victim's break-up with a boyfriend.
Williams said he went to the victim's room to awaken her so he could ask if she needed him to help her take care of the situation with her ex-boyfriend. Williams testified that he shook the victim gently by touching her hip area and that she awakened. He said he asked her if she needed any help with her former boyfriend and she said no, her brothers were taking care of the problem. He said he then patted her shoulder in an effort to comfort her, and she began screaming. He said he thought he must have touched a bruise and hurt her, and that he cupped his hand over her mouth and told her to be quiet so she would not awaken the other family members. He said she just kept screaming. He said that when the victim's younger brother came into the room he left and went to sit in the living room while the younger brother summoned the parents from the basement. He said that he sat there while the younger brother pounded on the basement door and called for the parents.
Williams testified that he eventually got up and went outside to the side door to the basement. He said he knocked on that door in an effort to awaken the parents so that they could help resolve the situation with the fourteen-year-old girl. He said the side door was unlocked, so he opened it and went into the basement. He said he could hear the victim talking with her mother upstairs, so he knew the parents had been awakened. He testified that the victim's father asked him what was wrong, and he replied the victim was upset about something. He said the victim's father got out of bed, put clothes on and went upstairs.
Williams testified that he stayed in the basement. He decided to have another beer. He said the victim's mother came downstairs and "she said if you ever put your hands on my daughter again then I'll kill you." He said he made a remark, but he could not remember for sure what he said. He testified that he finished the beer.
Williams said the victim's father then came back down to the basement, and he asked the father what was happening. The victim's father did not answer him. He said he "didn't know what was up" so he left for home.
The fourteen-year-old victim testified that Williams came into her bedroom twice. She said the first time he entered, she awakened because someone was touching her leg. She said Williams was rubbing her leg, and she told him to leave. She said he did leave.
The fourteen-year-old victim said she tried to go back to sleep. She heard the front door open and shut. She then heard some noises in the kitchen, and assumed they were made by one of her brothers. She said Williams then returned to her bedroom and turned her from her side onto her back. She testified that Williams sat on her bed, held a knife against her neck and threatened her that if she did not do as he said, he would kill her. She testified that the knife looked like a butcher knife owned by her family that she saw the night before in the kitchen sink.
She testified that she started screaming, and that Williams tried to cover her mouth with his hand. She testified that Williams was touching her on the buttocks and that he was "working from my hips up to near my breast area." She testified that she believed Williams wanted to have sexual intercourse. She kept screaming and struggling with Williams until her younger brother came into the room. She said Williams was on top of her but she kept struggling and was falling half off her bed when her younger brother arrived.
Williams got up and left when her younger brother arrived. She told her younger brother to get their mom. The victim, her younger brother and their mother all testified that the younger brother pounded on the basement door and called for their mother. When the mother responded and came upstairs the victim told her what happened and asked her to make Williams leave. The victim and her younger brother testified that initially, Williams was sitting in the living room on the couch. However, at some point he went back to the basement. The mother testified that when she went back down to the basement to change her clothes she saw Williams and confronted him.
The father testified that he heard the confrontation, got up and got dressed. When he went upstairs, his wife was in the living room comforting the fourteen-year-old victim, who the father described as hysterical. The father then dialed 911 and handed the phone to his wife since she knew more about what had happened. When the police arrived, Williams was no longer in the house.
The state also called two young women, one who was a schoolmate and one who was a schoolmate and a neighbor of the victim. They testified that they had heard about the events with Williams from the victim, and learned from her that the knife he used in the assault was missing. They testified that sometime later in the day, after talking with the victim, the schoolmate was visiting the victim's neighbor, and while crossing the grass near the neighbor's sidewalk she kicked a knife that was lying on the ground. Since the knife matched the description given by the victim, the girls carried it inside and called the victim's mother. At her direction, they took the knife to the mother, who in turn took it to a detective at a police station.
Personnel from the police lab testified that they had tested the knife for fingerprints. No discernable fingerprints were found on the knife.
Williams denied ever holding a knife or threatening the victim. In addition, the victim's younger brother testified that he did not see Williams holding a knife when he responded to his sister's screams. The younger brother testified that he did see Williams putting his hand over the victim's mouth. The younger brother said that Williams was sitting on the bed, leaning over the top part of his sister's body. He testified that Williams was bracing one foot on the floor to gain leverage to hold the victim down on the bed.
After considering all of the above testimony, the jury returned guilty verdicts for abduction and gross sexual imposition, but determined that Williams was not guilty of the greater charges of kidnaping and attempted rape. The trial court accepted the verdicts and eventually entered the sentences and the ruling that Williams is a sexual predator. Williams has presented three assignments of error to challenge his convictions and his classification as a sexual predator. The three assignments of error are:
"ASSIGNMENT OF ERROR I
 EDWIN WILLIAMS WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT MR. WILLIAMS IS A SEXUAL PREDATOR. (Vol. 4, p. 2-63; Vol. 5, p. 2-18).
"ASSIGNMENT OF ERROR II
 EDWIN WILLIAMS WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT ERRONEOUSLY FOUND MR. WILLIAMS' PRIOR MISDEMEANOR SEX OFFENSE CONVICTION TO BE A CRIME OF DISHONESTY. (Vol. 2, p. 392).
"ASSIGNMENT OF ERROR III
 EDWIN WILLIAMS WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. (Vol. 2, p. 405).
We will begin by addressing the assignments of error relating to Williams' trial.
Williams presents arguments in support of his second and third assignments of error that relate to one event during his trial. Prior to calling Williams to the stand to testify, Williams' trial counsel approached the trial court for a side bar motion. Williams' trial counsel told the trial court that the prosecution had just told him that Williams was previously convicted in Maryland of a misdemeanor sex offense. He asked the trial court to rule that Williams could not be cross-examined about the prior offense pursuant to Evid.R. 609. After some discussion, the trial court announced: "The Court has ruled that inasmuch as the offense would be one involving dishonesty that it could properly be used for impeachment purposes with the limiting instruction to the jury, but that the Court would not permit the name of the offense for which the conviction was had." The trial court further explained that the prejudice would far outweigh the probative value if the jury was informed of the title of the actual charge for which Williams was convicted, but since the trial court considered the offense to involve dishonesty, the jury could be informed of a prior conviction for an offense involving dishonesty so the jury could better assess credibility. When the trial court asked if that resolution was satisfactory, Williams' trial counsel answered yes. Williams then took the stand and his counsel asked him: "Mr. Williams, have you been previously convicted of a misdemeanor involving dishonesty?" Williams answered yes.
Williams now asserts in support of his second assignment of error that he was denied a fair trial when the trial court ruled that he could be cross-examined about his prior conviction for a misdemeanor sex offense. Williams argues that the trial court erred when it ruled that the prior conviction for gross sexual imposition was admissible pursuant to Evid.R. 609 because it was an offense involving dishonesty.
Evid.R. 609 provides, in pertinent part:
"(A) General rule
 For the purpose of attacking the credibility of a witness:
" * * *
 "(3) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance."
Our research shows that Ohio courts that have previously considered how these provisions apply to a previous conviction for gross sexual imposition have agreed that a conviction for gross sexual imposition does not involve dishonesty. See, e.g. State v. Brown (1989),65 Ohio App.3d 322, 327; State v. Cremeans (Sept. 16, 1993), Muskingum App. No. CA 93-9, unreported; and State v. Sizemore (May 26, 1992), Preble App. No. CA91-09-016, unreported.
In this case, we agree that the record does not support the trial court's ruling that the prior conviction for gross sexual imposition involved any dishonesty on the part of Williams. The trial court cited to no particular factual basis for its ruling that the prior sexual offense involved dishonesty, and the record does not contain any factual information that would suggest that Williams engaged in dishonesty when he previously committed gross sexual imposition. Accordingly, we agree with Williams that the trial court erred that Williams could be cross-examined to show that he had previously been convicted of an offense involving dishonesty.
However, our analysis does not end with that finding, since we must consider whether the trial court's ruling resulted in prejudice to Williams that denied him a fair trial. We agree with the Seventh District Court of Appeals of Ohio that: "In general, the existence of a prior conviction is inflammatory and should not be revealed to the jury unless specifically permitted under statute or rule." State v. Brletich (Jun. 28, 2000), Columbiana App. No. 98 CO 84, unreported (citing State v.Allen (1987), 29 Ohio St.3d 53, 55). However, the improper admission of a prior conviction is not always prejudicial. State v. Brletich (Jun. 28, 2000), Columbiana App. No. 98 CO 84, unreported. When the remaining properly admitted evidence overwhelmingly supports a finding that the accused committed the current offense, the improper admission of evidence relating to a prior offense is not prejudicial. Id.
In this case, we find that the admission of the evidence of Williams' prior conviction was not prejudicial for the following reasons. First, the jury was never informed that the prior conviction was for a sexual offense. Therefore, the jury was not led to conclude that Williams had a propensity to commit sexual offenses.
Second, Williams argues that he was prejudiced when the jury was informed that he had a prior conviction for an offense involving dishonesty because it weakened his credibility. He asserts that without the now disputed information, the jury would have found his version of the events that led to the charges in question the most credible.
Our own review of the record shows other valid reasons why the jury would not have considered Williams' account of the events the most credible even if the jury was not told about Williams' prior conviction for an offense involving dishonesty. For instance, Williams and the members of the victim's family all agreed that Williams was a trusted family friend prior to the events at issue took place. No motive was ever given for the victim or any member of her family to suddenly agree to frame Williams for the offenses at issue in this case. In addition, the jury was asked to consider whether it was believable that Williams would choose to try to counsel a fourteen-year-old girl about problems with her boyfriend sometime after five o'clock in the morning when the girl and all the other members of her family were asleep in their beds.
Finally, to the extent that any error that occurred with respect to the jury being informed of William prior conviction for a prior offense involving dishonesty was the result of Williams making that admission during his direct examination, we conclude that the error was an invited error. Therefore, pursuant to the doctrine of invited error, Williams cannot take advantage of an error that he invited or induced. See, e.g.State v. Murphy (2001), 91 Ohio St.3d 516, 535; State v. Luna (Sept. 2, 1994), Huron App. No. H-93-24, unreported. Williams' second assignment of error is not well-taken.
In support of his third assignment of error, Williams argues that he received ineffective assistance of trial counsel when his attorney failed to challenge the trial court's ruling that the prior offense was admissible pursuant to Evid.R. 609 and instead chose to introduce the evidence through Williams' admission of the conviction during direct examination. Williams again argues that his prior conviction did not involve dishonesty and that it should never have been revealed to the jury. He argues that the jury would clearly have believed his version of events if they had not been told he had a prior conviction for an offense involving dishonesty.
The Supreme Court of Ohio has ruled:
 "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; Strickland v. Washington [1984], 466 U.S. 668, followed.)" State v. Bradley (1989), 42 Ohio St.3d 136, 137, paragraph two of the syllabus.
Because the Supreme Court of Ohio has specifically followed the ruling of the United States Supreme Court in Strickland v. Washington (1984),466 U.S. 668, we are also guided by the reasoning discussed in that case. In Strickland v. Washington the United States Supreme Court indicated that when a court reviews counsel's performance "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. In addition, due deference must be given by the reviewing court to legitimate trial strategy decisions. Id. Keeping these guidelines in mind, we have reviewed the arguments that were presented regarding whether Williams received ineffective assistance of counsel.
Even assuming arguendo that the representation of Williams' trial counsel fell below an objective standard of reasonable representation when he chose not to challenge the trial court's ruling that gross sexual imposition is an offense of dishonesty, we conclude that Williams cannot meet the second part of the test for ineffective assistance of counsel. As we have already explained in our discussion of the second assignment of error, we cannot find that Williams' case was prejudiced by the erroneous revelation of his prior offense. Accordingly, William's third assignment of error is not well-taken.
In support of his first assignment of error, Williams argues that the state failed to prove by clear and convincing evidence that he should be classified a sexual predator. He argues that many of the factors listed in R.C. 2950.09 for trial courts to consider when assigning classifications to sex offenders were not present in his case. For instance, he asserts that he has no previous felony convictions of any kind, and that he was thirty-nine years old at the time the events at issue in this case happened. He says there was no evidence he used drugs or alcohol to impair the victim's judgment.
Third, he argues that the state failed to introduce into evidence a certified judgment showing that he was convicted of any criminal offense in Maryland in 1996. He argues that the trial court had no clear and convincing evidence upon which to rely for the finding that he had a prior conviction for a sexual offense.
Fourth, he argues that the state failed to show there was any pattern of abuse between himself and the victim in this case. He says since these factors were not shown the trial court erred when it assigned him a sexual predator classification.
Finally, he argues that the trial court failed to follow the requirements of R.C. 2950.09(B)(3). Specifically, he says the trial court failed to specify in his sentence and judgment entry of conviction that he was determined to be a sexual predator. He argues that the entry declaring him to be a sexual predator should be declared null and void.
R.C. 2950.09(B)(2) provides:
 (2) In making a determination under divisions (B)(1) and (3) of this section as to whether an offender is a sexual predator, the judge shall consider all relevant factors, including, but not limited to, all of the following:
"(a) The offender's age;
 "(b) The offender's prior criminal record regarding all offenses, including but not limited to, all sexual offenses;
 "(c) The age of the victim of the sexually oriented offense for which sentence is to be imposed;
 "(d) Whether the sexually oriented offense for which sentence is to be imposed involved multiple victims;
 "(e) Whether the offender used drugs or alcohol to impair the victim of the sexually oriented offense or to prevent the victim from resisting;
 "(f) If the offender previously has been convicted of or pleaded guilty to any criminal offense, whether the offender completed any sentence imposed for the prior offense and, if the prior offense was a sex offense or a sexually oriented offense, whether the offender participated in available programs for sexual offenders;
 "(g) Any mental illness or mental disability of the offender;
 "(h) The nature of the offender's sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse;
 "(i) Whether the offender, during the commission of the sexually oriented offense for which sentence is to be imposed, displayed cruelty or made one or more threats of cruelty;
 "(j) Any additional behavioral characteristics that contribute to the offender's conduct."
There is no requirement, therefore, that a judge determine that all of the listed factors exist before the judge decides that an offender should be assigned the classification of sexual predator. Accordingly, Williams' argument that some of the listed factors were not shown does not support his conclusion that he should not be classified as a sexual predator.
Furthermore, the record shows that Williams made a party admission that he was previously convicted of gross sexual imposition and that he served a year in prison for that conviction. He testified on direct examination that he had a prior conviction for a misdemeanor offense involving dishonesty. During the hearing on what classification should be assigned to Williams following his convictions in this case, the psychologist who evaluated Williams at the Court Diagnostic and Treatment Center testified that Williams told him during the evaluation that Williams was previously convicted of a sexual assault on a fourteen-year-old girl. Williams' admissions that he had a prior conviction for a sexual offense therefore relieved the state from any need to prove the existence of the prior conviction.
The record shows that the trial court did have clear and convincing facts to rely upon to reach the conclusion that Williams should be classified a sexual predator. The trial court noted Williams' prior sexual offense conviction and prison term. The court also noted the disparity in the ages of Williams and his victim (Williams was thirty-nine and the victim was fourteen), the threat of death made by Williams while committing this sexual offense, the force used in the offense and the apparent lack of remorse on the part of Williams. The court also pointed to Williams' unacknowledged alcohol problem, the diagnosis that Williams suffers from an anti-social personality disorder and the expert opinion of the evaluating psychologist that Williams poses a high risk for re-offending. Accordingly, Williams' argument that the trial court had no clear and convincing evidence to support its ruling that he be classified as a sexual predator is not well-taken.
However, we must still consider Williams' argument that the trial court did not strictly comply with the requirements of R.C. 2950.09(B)(3) that are, in pertinent part:
 "If the judge determines by clear and convincing evidence that the offender is a sexual predator, the judge shall specify in the offender's sentence and the judgment of conviction that contains the sentence that the judge has determined that the offender is a sexual predator and shall specify that the determination was pursuant to division (B) of this section."
In this case, the record contains two separate judgment entries journalized in the trial court on the same date, August 9, 1999. In one judgment entry, the court entered its findings that Williams was guilty of gross sexual imposition and abduction and entered its orders regarding the sentences imposed for each conviction. In the second judgment entry, the trial court entered its ruling that pursuant to the factors listed in R.C. 2950.09(B) there was clear and convincing evidence that Williams is a sexual predator and its orders that Williams comply with his duties to register as a sex offender.
Williams argues that the existence of two separate judgment entries, one containing the convictions and sentences and the second containing the ruling that he is a sexual predator, rather than one judgment entry containing all of the rulings, renders the finding that he is a sexual predator void. We find that accepting Williams' arguments under the circumstances of this case would elevate form over substance.
In this case, the record shows, through transcript, that the trial court properly followed procedure by first ruling that there was clear and convincing evidence that pursuant to the factors found in R.C.2950.09(B), Williams is a sexual predator. The trial court then preceded to sentencing. While it would have been better form for the trial court to enter all of its rulings in one judgment entry, we can discern no prejudice to Williams when the trial court did make the rulings in the proper order, did issue all of the rulings in writing, did journalize all of the rulings on the same day and did make the necessary recitation of the factors and statute sections it relied upon to reach its rulings.
We find that the facts in this case distinguish it from the few cases we did locate where some of our sister district courts of appeal reversed a ruling on a sexual predator classification for failure to comply with the requirements of R.C. 2950.09(B)(3). See, e.g. State v. Butler (Oct. 4, 2000), Wayne App. No. 00CA0015, unreported; State v. Jones (Sept. 30, 1999), Cuyahoga App. No. 74503, unreported; State v. Hammons (Dec. 15, 1997), Clermont App. No. CA97-02-007, unreported; and State v. Dycus
(Dec. 4, 1997), Franklin App. Nos. 97APA05-700 and 97APA06-865, unreported. In State v. Butler, (Oct. 4, 2000), Wayne App. No. 00CA0015, unreported, for instance, the trial court made an oral finding that the accused was a sexual predator, but never made that finding in a written judgment entry. None of the above cited cases contained facts showing that the trial court issued and the clerk of courts journalized a separate judgment entry containing the ruling that the offender in question was a sexual predator on the same day that the trial court issued and the clerk of courts for the trial court journalized the conviction and sentencing for that offender.
We find that under the unique facts of this case, the trial court substantially complied with the requirements of R.C. 2950.09(B)(3) and we decline the invitation to find the classification that Williams is a sexual predator void. Williams' first assignment of error is not well-taken.
After carefully reviewing the record and considering the arguments presented on appeal, we conclude that Williams was not denied a fair trial. The judgment of the Lucas County Court of Common Pleas is affirmed. Williams is ordered to pay the court costs of this appeal.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _________________________________ Peter M. Handwork, J.
 Richard W. Knepper, J., Mark L. Pietrykowski, P.J, CONCURS IN JUDGMENT ONLY.